Good morning, Your Honors. My name is Eric Smith from Facts & Law Group. I represent the appellant, Big Y Foods, Inc. May it please the Court. On behalf of Big Y, we're asking that this Court reverse the    v. Big Y Foods, Inc. judgment of the District Court, which rendered summary judgment against Big Y in favor of Aetna for twice what it paid for Mrs. Guerrera's medical care under the Medicare Secondary Payer Private Cause of Action provision. Mr. Smith, if I can be hopelessly simplistic, is it your position that Humana and Avandia are wrong? That is to say, basically, we should be, in your view, a circuit split on this because they are mistaken? Or are you trying to say that this case is different? Are you trying to distinguish this case? I appreciate the question. The answer to your question is, with respect to the first prong of the judge's conclusion that the private cause of action allows MAOs to be party plaintiffs, that's where Avandia and Western Heritage go against us. That's where we've cited the dissenting opinions of Judge Joe Flatt and prior, suggesting that MAOs should not be party plaintiffs, have access to that private cause of action. Yes, the answer is, those circuits, the third and the eleventh circuits, got it wrong on that issue, whether they should be plaintiffs. Go ahead. I'm sorry. I was just going to say, as to the second prong of the question, however, whether or not, in a case like this, where the cause of action is asserted against a non-group health insurer like Big Y, our position is that that issue was never addressed, never analyzed by the Avandia Court for sure. It was gently approached by the Western Heritage case, but never adjudicated. The issue was never analyzed. It was only analyzed, in fact, by Judge Joe Flatt and Judge Prior in their dissenting opinions. Counsel, didn't Big Y get a letter from Mrs. Guerrero's counsel saying that there was a lien on the proceeds? Yes. And so they ignored that when they paid her $30,000, unallocated to pain and suffering or medical expenses? I don't know if I would say ignored. They were certainly aware of it. There was clearly a dispute. What would you say if not ignored? Well, they certainly didn't make payment.  Nobody made payment to Aetna. Mrs. Guerrero had the money. She didn't make payment to Aetna. She was being advised by her counsel as to the various reasons. I suspect it wasn't me, her individual counsel, why she had no obligation to pay. Big Y at the time was being represented by its own counsel and was being advised as to the reasons why it didn't think it had an obligation to pay. And so there was clearly an independent dispute between the parties resulting in ongoing dispute, resulting in indemnity agreements. No question about that. Fast forward to my involvement at the time of the appeal, and it was abundantly clear to me, excuse me, not at the time of the appeal, at the time suit was filed in federal court against all the defendants in this case, abundantly clear to me that the case was not resolvable because at that point, despite the fact that there was state law remedies available to it, subrogation, lien, unjust enrichment, contract, all sorts of state law remedies, it was clear to me that Aetna was not interested in so-called actual damages, meaning the money it had actually paid. In fact, by the time I got involved when suit was filed, it was clear to me that Aetna was demanding actual damages, so-called damages, in addition to significant sums of attorney's fees for which there was no entitlement under any of those common law, state law claims. And in fact, we learned later in the litigation that Aetna was not exposed to any attorney's fees. So the demand for attorney's fees put forth by really the collection agency that was running the show and that had secured the lawyers and that was funding the litigation and the collection efforts, that's where that all came from. So the case became unsettlable. I'm an old state court judge and what this looks to me is like garden variety, subrogation, just as you described state law penalties, but I think Congress was trying to replicate that and as an added incentive, they gave double damages to encourage enforcement. Congress has the right to do that, should they so desire, don't they? Yes. Congress has the right to do that, should they so desire. I wish I could give this court a detailed legislative history behind various portions of Medicare, the Medicare Secondary Payer Act and various amendments that came along the way. We can't. It doesn't exist. Somebody must know. We don't know. If we did know, it would be all over the party's briefs in this case and it's not because it's not there. So what we're left with is a bunch of theories, a bunch of judicial determinations about what Congress must have intended along the way with various components of these amendments. But Congress, to answer your question, did have the authority to incentivize. Congress gave that authority to the United States, to CMS, to the secretary, in fact, to protect the Medicare trust funds. There's no question about that. Congress gave, in fact, the authority to pursue a private cause of action against group health insurers, which is the entirety of our Part B of our argument in this case. They did give that. Didn't Congress add tort feasors as possible defendants as well? Congress added tort. So I think what you're referring to, Your Honor, the answer is yes. And Congress did that after the 2003 decision from this court that you authored, the Mason case, which is of particular interest to me and particularly persuasive. And here's why. In that case, this court, Your Honor and other members of this court, looked at a piece of the Medicare Secondary Payer Act, and you applied plain language analysis. This court held under your authorship that the term tort feasor was not among the various categories of people in the primary plan definition. Your Honor looked at the statute, didn't try to figure out what Congress must have intended. You applied a plain language analysis and said it's not there. It's not there. Therefore, case dismissed. And by the way, since the statute is clear and unambiguous, Chevron deference is not an issue despite the contrary views submitted by the United States in the amicus brief. That is precisely and by the way, of course, the statute was amended thereafter. Your Honor, I should say this court invited Congress to make that amendment if it saw fit, perhaps to clarify its original intent, perhaps to establish its new intent going forward. We'll never know that without the evidence that this court applied under your authorship in 2003. It's precisely the rationale that Big Why is urging this court to follow. I can't say the same with respect to whether MAOs are proper plaintiffs under the cause of action. The statute is simply silent on that issue, right? It doesn't say who a proper plaintiff is in this case. And so there's arguments back and forth. The statute wasn't even created. I'm sorry, the statute existed before MAOs even existed. So we have to try to piece that together. And I urge this court to, as Judge Sack indicated, look at what I think is the persuasive analysis of judges Joe Flatt and Pryor as to whether MAOs even belong as plaintiffs. But even if they do... Can I pause you there? And I know I'm going to take you a little bit over your time, but I have a question for our presider. Could you just map out for me your textual argument with respect to the private cause of action about why you think, based on the plain language, it does not apply? And just to be upfront, I think I agree with one of what I think was a point you made, which is it's almost impossible for us to discern some hypothetical intent of Congress here because there have been lots of amendments, and I certainly can't figure it out. I think there are policy arguments that could have persuaded Congress to do any number of things. There may have been cross-cutting interests, policy interests here. So if we just look at the text of the private cause of action, which, as I read it, doesn't tell us either who can sue or who can be sued. How do you read it, in particular, the references in 3A to the cross-references to paragraphs 1 and 2A? What do we make of those cross-references? What do they mean? So what they mean, in my assessment and in the assessment of Judge Joe, you know, drawn from those dissenting opinions, that the private cause of action doesn't tell us who the party plaintiff is, but it does tell us who the party defendant is. It's against a primary plan which fails to provide for primary payment or appropriate reimbursement in accordance with paragraphs 1 and 2A. And so we look at paragraphs 1 and 2A, and we see throughout paragraph 1, it is an exclusive reference to group health insurance. It says you can't discriminate against people just because they're on Medicare. It says, among other things, that even if you are on Medicare and you also have group health insurance, group health insurance is primary. Paragraph 2A goes on to list a whole host, as Judge Pooler said, it goes on to list who is a primary plan, when Medicare can make secondary payments, and when it must wait, when it must condition if it's the United States. So the textual argument in this case is that in accordance with paragraphs 1 and 2A, by definition, can only occur in the environment of group health care coverage, because paragraph 1 only applies in all of its subsets to group health care coverage. As Judge Joe Flatt points out, there is no other way to do it. If you're going to do it, you have to do it before the conjunctive and, which not only the U.S. Supreme Court So I understand your point. Then you're saying that private cause of action, there's no reason, in your view, to sort of interpret it in pari materia with the action of the United States, because the action of the United States to recover is in a different section. It's, you know, about six times as long and much more detailed. So this is not sort of a parallel provision in the sense that it necessarily applies in the same way that CMS would have the right to recover conditional payments. Is that Absolutely true. Absolutely true. The government's in a different section, has a number of specified target defendants that they can bring, a number of remedies that don't exist in the private cause of action. They're not in the private cause of action. And so the primary purpose of the Medicare Secondary Payer Act is to protect the Medicare trust funds, right? The government's money at That's not very helpful, right? I mean, because there are all sorts of purposes out there. Congress also clearly had a purpose to shunt off some of the costs to the private sector, right? It created Medicare Advantage. The Medicare Advantage plans have to bid. So the government wants to be in a position where they're paying as little as possible to the ethnos of the world to provide Medicare Advantage. And so you would think, well, allowing them to recover as many costs as possible is going to keep their costs down. So they're not going to charge the government as much. Well, we can hypothesize a million policy arguments that might persuade Congress to give them double damages or they could write a statute, give them treble damages, whatever. The question is not so much what do we think would be a great idea for Congress to do? It's what did they do with the statute? Entirely agree with what you just said. Only would I would mention that I need to be careful when we're talking about policy issues only on the financing of Medicare Advantage, for example. I know it's an instinct to think that, for example, the cost will go down if they can recover more. The alternative is that simply the Medicare provide the M.A.O.'s profits increase. The costs don't actually go down because that's not how Medicare is priced. We need to be there's no after the fact reconciliation or true up that occurs. But don't we periodically have to bid and say, well, we're willing to cover this for, I don't know, make it up whatever, $800 a pop. Yeah. The costs were going up. They might drop out of the market and say, you know what, government, this is not worth it to us. We'll never make money at 800 ahead. They might do that, except it's cash cow. It's a cash cow and it's churning tons and tons of cash for them. And that's why we don't know. And that's not for us. Fair enough. Like to assess what's profitable or not. But thank you for your answer. I appreciate it. So you've retained two minutes for rebuttal. Thank you. You're now from Aetna. So you notice I gave a little extra time. I will not be rough with you if you go over your time. Well, thank you, Your Honors. I hope not to need all of it, but happy to answer any of the court's questions. So I'm Michael Abadi on behalf of Aetna this morning. Your Honor, the question that's presented by this case is one that's been repeatedly answered in the same way that two different district court judges did in this case. That is by holding that Medicare Advantage plans can use the secondary payer laws private cause of action to sue a primary plan that refuses a valid reimbursement demand from EMAO. As Judge Sack pointed out. Did Aetna ever just ask for reimbursement? I mean, opposing counsel alluded to a long history. But did Aetna ever just write to BY and say we paid $9,800 in medical expenses? Would you give that to us? Yes, Your Honor. It was very clear from the record here that Aetna gave actual notice to BY before a settlement was reached. Before they made $30,000? Oh, correct. Yes. Yes, that's absolutely clear. In the record here at JA, page 98, it was clear that Aetna gave notice to BY through its recovery vendor. And then at page 123, the deposition of BY's claims manager, she admitted that the settlement payment wasn't made not only after notice of the lien, but after receiving a lengthy letter explaining the rights of Medicare Advantage plans under the existing statutes and case law. So there's no dispute. In which case they would only get a single recovery, not a double. And not even the full $9,000 in change, Your Honor. I don't know all the details of the settlement, but if the formula that is set forth in the federal regulations, which is 42 CFR 411.37, were to be applied here, a discount would have been taken for the procurement costs. So the recovery would have been something in the neighborhood of $6,000, maybe $6,500, depending on the share of attorneys fees plus the amount of expenses that the attorneys had put forward to work the case up and make the settlement demand. So they could have paid $6,000 or they could have negotiated lower from that amount. That happens every day. Counsel, would you repeat that regulatory citation for me? Yes, Your Honor. 42 CFR 411.37. It's the detailed regulation that says how much a Medicare Advantage plan will recover. And it's really three parts. It's there's one formula if the settlement is above the amount of the lien that's in subpart C. There's one if it's below the amount of the lien. And then there's a third one that's applicable in the litigation here. If the MAO has procurement costs itself because of resistance to its recovery rights, then there's another formula that's a lesser than that can as it would in this case back out the amount that the MAO can. You wouldn't have to give the reduction for procurement costs. So at some point, Big Why was told by someone that they didn't have to pay it. Can I conclude that? It seems clear to me from reading the deposition transcripts and the records, they concluded legally they didn't have an obligation to do it. I don't know which attorney, whether it was the plaintiff's attorney or Big Why's attorney or both. They made a decision that they didn't have an obligation to pay. But that's inconsistent with all of the case law on this question. And so, you know, in our view, it's a very straightforward application of existing precedent. So the one thing I would not use the term I would not use to describe this statutory analysis is straightforward. I find it as clear as mud. I understand that you've got case law on your side. That's certainly true. But this private cause of action doesn't tell us who can sue and who can be sued. I mean, it's interesting. It's like diagramming a sentence where you have neither the subject nor the direct object. So it's certainly quite an exercise. Could I ask you the same question I asked your adversary to look at the language of the private cause of action, so 3A, and tell me what is wrong with the argument posited by your adversary that the cross references to paragraph one and 2A, which are joined by the conjunctive and require or limit this cause of action to failures to pay when we're dealing with the subject covered by paragraph one, which is that involving group health plan. What is what is wrong in your view with that reading of the private cause of action? There are a couple of things wrong with it, Your Honor. If you'll indulge me, I wanted to get to these points. First, it's inconsistent with this court's own holding in the Manning case, which allowed a suit against the workers' compensation plan. So it would create an intra-circuit conflict on result. Second, it is inconsistent not only with the results in Avandia and Western Heritage, where the one and 2A language was considered in the Western Heritage case, but it would be an express conflict with two decisions of the Sixth Circuit that are cited in our brief addressing this very language. Yeah, but we knew that sometimes, right? We sometimes say, you know, you got it wrong. I'm asking you to give us our textual analysis. I understand there are other cases, but would you just map out the logic for us? Yes. Yes. And if you'll indulge me for a second, I'd like to begin with a little bit of legislative history about how we got one and 2A. That was not the original language in the statute. And I want to explain why the history of this statute makes clear. When it was enacted in 1986, the language read as follows. There hereby is created a private cause of action for damages, which shall be in an amount double the amount otherwise provided. So that's the same. But then it said, in the case of a workman's compensation law or plan, an automobile or liability insurance policy or plan or no-fault insurance plan, a group health plan or a large group health plan, which is made primary payer under paragraph one, two, three or four, respectively, in which fails to provide payment or appropriate reimbursement in accordance with respective paragraphs. What that recognized is at the time the cause of action was created, the Medicare secondary payer law was very differently organized. Originally, it only applied to workers' comp. And then over time, Congress kept amending it. They added liability and no-fault insurance. Then they added group health plans. Then they added large group health plans. So it was the private cause of action set under paragraph one, two, three or four. Now, in 1986, they reorganized the entire MSP Act. And what they did is they took the separate paragraphs and combined them into essentially what is 2A now. All of the secondary payer provisions and the reimbursement provisions exist in 2A, with the exception in 2B for conditional payments. One is, if you look at it, it's not a secondary payer provision in the same way that it requires reimbursement. It's a prohibition on denying group health plan benefits to Medicare beneficiaries because of their eligibility for other forms of coverage. So Judge White, in her concurrence in the biomedical case, and I would really encourage the court to take a look, it's at 656 F3, 297. Judge White traces the history of this change and said, look, when Congress reorganized paragraphs one, two, three and four into one and 2A, changing this cross-reference to just say one and 2A was never intended to limit it only to group health plans. It was meant to preserve what had always been the rule, which is any primary payer is subject to suit if they don't reimburse. And I think that's the best way to read the statute. I think you have to read it in light of that history and that there was simply, there's nothing in the 1986 amendments of the private cause of action that added one and 2A to suggest they intended to exclude tort feasors or liability insurance. In fact, that's one of the major issues here. Secondary payer issues don't come up that often in the coordination of benefits with group health plans. I mean, it's an issue, but the circumstance where this is most important are disputed liability settlements for, say, injuries, car accidents, falls, that kind of thing, or circumstances where a lot of Medicare beneficiaries simply don't understand if they were hurt in a car accident, they go to their doctor, they're not thinking that, gee, my no-fault carrier might be primary here. They're just thinking, I have Medicare. I have Medicare with Retinol, Humana or UnitedHealthcare. So that's the information to give the doctor. There's just no indication in the use of 1 and 2A in light of the reorganization that Congress somehow meant to void and gut the ability of plans. Now, it also would apply, note, Your Honor, it also would gut the government's ability to go after these same sorts of things. Your Honor referenced that there is a separate cause of action for the United States in paragraph 3A, and that is the United States may, in accordance with paragraph 3A, collect double damages against any such entity. So such entity is the entity specified in 3A. So if it were true that the cause of action in 3A only applies to group health plans, then the United States loses its ability to sue tortfeasors, liability insurance carriers, no-fault carriers and all these other entities because of that cross-reference. So this is why, you know, I'm not merely pointing to the existence of other precedent. We think that other precedent is exactly correct. The most sensible way to read the statutory scheme is that Congress intended all primary payers to pay, and the best way to see that is in 2A itself. 2A opens with a very broad command that payment under this subchapter may not be made except as provided in subparagraph 2B. Under this subchapter, as Avandia held, as Western Heritage held, that means under the Medicare statute, including Part C and Part D. Congress was very clear and we know from the right to charge provision which has been invoked, you know, as an argument, that the cross-reference in that right to charge provision says that Medicare Advantage payments are made secondary pursuant to B2. So if I could just understand, I think one of the things that you're arguing is that the cross- reference to 3A in the government's action sheds light on the notion that the references to paragraphs 1 and 2A in 3A are not meant to limit the recovery to that of group health plans, because if you would do that, then the government would be bound to be limited to group health plans. But when you look at little 3, which is the government's cause of action, it references a much more expansive group of entities beyond group health plans. So that, you know, if you have that laundry list of people the government can sue, but then there's a cross-reference to 3A, if one limits 3A to only group health plans, it would sort of be internally contradictory. I think that's exactly right, especially, Your Honor, in light of the legislative history I outlined where, you know, they were in pairing material, right? Originally, it was the full laundry list it made clear. When they reorganized, they used the shorthand term primary payer, which was already defined in the statute to include all of those other entities listed in B3, the government's cause of action. So they were always the same. Yes, when they reorganized, they used slightly different words and slightly different shorthand. It may have been, you know, more ideal for Congress to continue breaking them out in the same way that it did before, but there's no indication that simply changing the cross-reference to adjust for the new structure of the statute meant to undermine the purpose of the law, which is to entitle primary plans to not to entitle, to require primary plans to pay any time they are primary to a Medicare payment. That's the basic purpose of the statute, and it's always operated that way. I see that I have exceeded my time. I'd be happy to answer any other questions that the court has. Thank you, counsel. We'll hear from Big Y, which has reserved two minutes for rebuttal. Thank you. Thank you. Thank you, Your Honors. Counsel said that the Section 2A was always intended to include all primary payers, including tortfeasors. That's an interesting comment because that's exactly what this court did not find in 2003 when Judge Pooler, when you authored that decision, you found that Congress omitted the term tortfeasors, and if they did intend to include tortfeasors, they would have to amend the legislation. Ultimately, that's what happened. But that doesn't change. That doesn't mean your decision, the court's decision in 2003 was wrong. It doesn't mean that at all. The court applied plain language analysis and reached the correct conclusion, and that led to an amendment, which is what the court invited. But you don't deny that tortfeasors are now included. Tortfeasors are now included. There was also a question... Counsel, can I ask you a question that was raised in one of the amicus briefs? Yes. And I don't know how much this sheds light on it, but I'd be interested in knowing your view. There's a suggestion that the enactment of the PAID Act can only be explained by a desire to allow medical advantage organizations to find out more easily whether the... I'm sorry. No, I'm sorry. It's the other way around. That it can only be explained by a desire to allow, I suppose, the big whys of this world or other property casualty insurers to find out whether somebody they're paying money out to is covered by an MAO or, I suppose, by CMS. And the only reason you would do that is you want to help these folks avoid exposing themselves to a double damages remedy after the fact from CMS or an MAO, right? The idea is that they'll find out in advance, and then before they make a payout, they can say, oh, wait a minute. Hey, is this a... Is there an MAO that's already made a payment? Let me know if you've got a lien. I'll pay off the lien, and that way I don't expose myself to double damages remedy. If that is a correct reading of the only discernible purpose of the PAID Act, wouldn't that presuppose that Congress was effectively legislating against the backdrop of these cases like Avandia and effectively ratifying it, even if they didn't have the congressional purpose way back when to allow an MAO to sue? They had effectively incorporated that intent by the time they enacted the PAID Act. Could you maybe react to that argument? Is that a sensible argument, or what's the flaw in that argument? It just assumes a lot. It assumes a lot of legislative intent, and it assumes that we are assigning an intent on the part of Congress to determine the nature of the claims between these parties. And this goes back to the earlier question that somebody mentioned, or the comment about whether there was an obligation to pay. I think Judge Pooler mentioned it. Does somebody know they have an obligation to pay? The question is an obligation to pay pursuant to what? I don't think there's objectively any question that there... I'm going to answer your question, Judge Nardini, I promise, that there's an obligation to pay in this case. And I think that's avoiding payment, an obligation to pay. Now, there may have been a dispute between these parties as to who was going to pay. I'm convinced there was an obligation to pay on one or both parties cases at some point. The question is whether that obligation is a state law obligation or a federal law obligation, the breach of which you can be sued in federal court under subject matter jurisdiction and sued for double damages. That's the key distinction. You're saying that the PAID Act could be explained as a rational exercise of congressional activity in furtherance of state law subrogation claims. To put the parties together. Medicare tells who the MAOs are. MAOs figure out who the primary payers are. The key is to put them together. Before the PAID Act, it was only a one-way communication. It's not explained solely by reference to the existence of a federal cause of action, you're saying, because there might very well be some utility to this communication to sort out state law causes of action. Yes, and that is addressed in our brief squarely. And lastly, just as a matter of statutory organization, it is worth noting, I suspect, that in response to your comments, Judge Nardini, that paragraph 3A, the private cause of action at issue in this case, is statutorily nested in Section 3. When you look at Section 3, it's called enforcement. And Section 3A, 3B, and 3C all pertain to group health insurance. So meaning the private cause of action that we've been discussing, that I say is inextricably linked to the group health coverage, is in fact nested in a series of statutes, 3A, 3B, and 3C, all of which relate solely to group health insurance. And that explains the connection in that regard. Thank you. Thank you. Thank you both for great argument for reserved decision. Thank you.